AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 MAR 24  AM 8: 57

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
EAST DIV. COLUMBUS

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
The residence located at 1475 Bryden Road, Columbus OH
43205, including any curtilage, detached building, vehicle or,
person that may possess or contain any digital device, and
any computers or related media located therein/thereon

)
)
)
)
)
)

Case No. 2 : 20-mj-229

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment C, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 3, 1519, 1591, 2251, 2252 21 U.S.C. Section 841 & 846 | Accessory after the fact, Destroying evidence, Sex trafficking minors, Obstruction of sex trafficking enforcement, Producing/receiving/possessing child pornography, Possession with intent to distribute controlled substances & conspiracy to do so |

The application is based on these facts:

See attached affidavit incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael A. Harey, SA FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/24/2020

City and state: Columbus, Ohio

*Judge's signature*

Hon. Elizabeth Preston-Deavers, U.S. Magistrate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF** | ) **Case No.** 2: 20-mj-229 |
| **The residence located at:** | ) |
| **1475 Bryden Road, Columbus OH 43205** | ) |
| **including any curtilage, detached building, vehicle or** | ) |
| **person that may possess or contain any digital device;** | ) **Magistrate Judge** |
| **the person of Crystal D Porter, and any vehicle Porter** | ) |
| **is driving or otherwise occupying and any computers** | ) |
| **or related digital media located therein/thereon,** | ) |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael A. Harey, Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state as follows:

**I.     EDUCATION TRAINING AND EXPERIENCE**

1.      I am a Special Agent with the FBI assigned to the Cincinnati Division and I have been a Special Agent since October 2008, having worked on counterterrorism investigations and public corruption investigations as a Special Agent. I am currently assigned to the FBI Child Exploitation Task Force, investigating matters involving the online exploitation of children and child pornography. I have made arrests and have executed search warrants pertaining to these types of investigations.

2.      Prior to becoming a Special Agent with the FBI, I served as a U.S. Border Patrol Agent for approximately five years and a Federal Air Marshall for approximately five years; having begun my federal law enforcement career in February 1998. While performing my duties as a Special Agent, I have participated in various investigations involving computer-related offenses and have executed numerous search warrants, including those involving searches and seizures of computers, digital media, software, and electronically stored information. I have received both formal and informal training in the detection and investigation of computer-related offenses. As part of my duties as a Special Agent, I investigate criminal child exploitation and child pornography violations, including the illegal production, distribution, transmission, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A.

3.      As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

1

## II. PURPOSE OF THE AFFIDAVIT

4.     The facts set forth below are based upon my own personal observations, investigative reports, and information provided to me by other law enforcement agents. I have not included in this affidavit all information known by me relating to the investigation. I have set forth only the facts necessary to establish probable cause for a search warrant for the residence located at 1475 Bryden Road, Columbus OH 43205 (the SUBJECT PREMISES), and the person of Crystal D. PORTER. I have not withheld any evidence or information that would negate probable cause.

5.     The SUBJECT PREMISES to be searched is more particularly described in Attachment A, and the SUBJECT PERSON to be searched is more particularly described in Attachment B, for the items specified in Attachment C, which items constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. §§ 3, 1519, 1591, 2251, and 2252 – tampering with evidence, child sex trafficking, obstruction of a child sex trafficking enforcement investigation and production, distribution, receipt and possession of child pornography; and 21 U.S.C. §§ 841 and 846 – Possession With Intent to Distribute a Controlled Substance and Conspiracy to Possess with Intent to Distribute a Controlled Substance. I am requesting authority to search the SUBJECT PREMISES, wherein the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## III. APPLICABLE STATUTES AND DEFINITIONS

6.     Title 18, United States Code, Section 3 makes it a federal crime for any person, knowing that an offense against the United States has been committed, receives, relieves, comforts, or assists the offender in order to hinder or prevent the offender's apprehension, trial or punishment.

7.     Title 18, United States Code, Section 1519 makes it a federal crime for any person to knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, or in relation to or contemplation of any such matter or case.

8.     Title 18, United States Code, Section 1591 makes it a federal crime for any person, in or affecting interstate or foreign commerce to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize or solicit, by any means, a person, knowing, or in reckless disregard

2

of the fact that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act. Subsection (d) of this section makes it a federal crime to obstruct, attempt to obstruct, or in any way interfere with or prevent the enforcement of Section 1591. Section 1594 of the same title prohibits attempts or conspiracies to engage in such acts.

9.      Title 18 United States Code, Section 2251(a) makes it a federal crime for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in, or have a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, if such person knows or has reason to know that either the visual depiction will be transported or transmitted via a facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, or that the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce, or if the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce. Subsection (e) of this provision further prohibits conspiracies or attempts to engage in such acts.

10.      Title 18, United States Code, Section 2252, makes it a federal crime for any person to knowingly transport, receive, distribute, possess or access with intent to view any visual depiction of a minor engaging in sexually explicit conduct, if such receipt, distribution or possession utilized a means or facility of interstate commerce, or if such visual depiction has been mailed, shipped or transported in or affecting interstate or foreign commerce. This section also prohibits reproduction for distribution of any visual depiction of a minor engaging in sexually explicit conduct, if such reproduction utilizes any means or facility of interstate or foreign commerce, or is in or affecting interstate commerce.

11.      Title 21, United States Code, Section 841, makes it a federal crime for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with the intent to manufacture, distribute, or dispense, a controlled substance, including marijuana, oxycodone and percocet. Title 21, United States Code, Section 846, makes it a crime for any person to attempt or conspire to commit any offense defined in Section 841.

12.      The term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2) (A) as: actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.

3

13.     The term "minor", as used herein, is defined pursuant to Title 18, U.S.C. § 2256(1) as "any person under the age of eighteen years."

14.     The term "visual depiction," as used herein, is defined pursuant to Title 18 U.S.C. § 2256(5) to "include undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."

15.     The term "computer"[1] is defined in Title 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

16.     As it is used throughout this affidavit and all attachments hereto, the term "storage media" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## IV.     COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

17.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

18.     I submit that if a computer or storage medium is found in the SUBJECT PREMISES, there is probable cause to believe the records will be stored on that computer or storage medium, for at least the following reasons:

        a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a

---

[1] The term "computer" is used throughout this affidavit to refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets. Where the capabilities of these devices differ from that of a traditional computer, they are discussed separately and distinctly.

4

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, specifically other storage media that were seized from the property of Larry Dean PORTER, I am aware that computer-related devices were used to generate and store documents and records that constitute or are related to child pornography. There is reason to believe that there is a computer system currently located on the SUBJECT PREMISES.

19. Computers, tablets and smart/cellular phones ("digital devices") are capable of storing and displaying photographs. The creation of computerized or digital photographs can be accomplished with several methods, including using a "scanner," which is an optical device that can digitize a photograph. Another method is to simply take a photograph using a digital camera or cellular phone with an onboard digital camera, which is very similar to a regular camera except that it captures the image in a computerized format instead of onto film. Such computerized photograph files, or image files, can be known by several file names including AGIF@ (Graphic Interchange Format) files, or "JPG/JPEG" (Joint Photographic Experts Group) files.

20. Digital devices are also capable of storing and displaying movies of varying lengths. The creation of digital movies can be accomplished with several methods, including using a digital video camera (which is very similar to a regular video camera except that it captures the image in a digital format which can be transferred onto the computer). Such

computerized movie files, or video files, can be known by several file names including "MPG/MPEG" (Moving Pictures Experts Group) files.

21. The capability of digital devices to store images in digital form makes them an ideal repository for child pornography. A single CD, DVD, or USB thumb drive can store hundreds or thousands of image files and videos. It is not unusual to come across USB thumb drives that are as large as 32GB. The size of hard drives and other storage media that are used in home computers and cellular phones have grown tremendously within the last several years. Hard drives with the capacity of several terabytes are not uncommon. These drives can store hundreds of thousands of images and videos at very high resolution. Tablet devices have average storage capabilities ranging from 4 Gigabytes to 256 Gigabytes. In addition, most tablets have the ability to utilize the various drives (thumb, jump or flash) described above, which can allow a user to access up to an additional 256 Gigabytes of stored data via the tablet. Modern cell phones have average storage capabilities ranging from 4 Gigabytes to 128 Gigabytes. In addition, most cellular phones have the ability to utilize micro SD cards, which can add up to an additional 128 Gigabytes of storage. Media storage devices and cellular phones can easily be concealed and carried on an individual's person.

22. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

      a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

    23.   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

24. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## V. INVESTIGATION AND PROBABLE CAUSE

25. In March 2020, a Jackson County Sheriff's Office (JCSO) Confidential Human Source (CHS) provided information to a JCSO detective regarding a subject by the name of Larry PORTER who had contacted the CHS via telephone in approximately 2013. At that time, PORTER offered to provide the CHS with narcotic pills in exchange for allowing PORTER to "babysit" her boyfriend's 2-year-old child. The CHS described the term, "babysit" to mean that "PORTER had intentions to take sexually explicit images of the child while in his care." Since approximately January 2020 and on numerous occasions, this CHS has provided reliable information to law enforcement regarding potential criminal activity of others.[2]

26. To corroborate the information provided by the CHS, the JCSO detective had the CHS make a controlled contact with PORTER via Facebook Messenger, in which the CHS was to inform PORTER that the CHS could make a 7-year-old child available to engage in sexual activity with PORTER.

27. Beginning on March 9, 2020, PORTER exchanged Facebook Messages with the CHS regarding plans to meet with the 7-year-old girl in exchange for $80 in cash. Your affiant observed the Messenger communications between the CHS and PORTER on the CHS' Facebook account and created screen captures of those communications: The communications began on

---

2 Due to certain unusual sensitivities regarding this CHS and the manner in which s/he has obtained information in this case and in the past, additional details specific to the CHS' access to the reported information are not included in this affidavit, as it would tend to identify the CHS and compromise his/her position.

Monday, March 9, 2020, an approximately 1:30 in the afternoon, when the CHS sent a message saying "Dean." PORTER responded later that evening saying "hello," and an ongoing conversation ensued the following day:



10







28.     The CHS and PORTER engaged in further conversations regarding a time and location to meet, with PORTER inquiring how long the CHS would be able to have custody of the child. As depicted in the screenshots below (redacted to protect the privacy of the child), the CHS indicated that she could keep the child with her for a while, and that the child's mother was "strung out on h bad," then sent a picture of the child, and explained the situation further, after which she and PORTER negotiated a price of $80 that PORTER would pay to the CHS when she picked the child up the following day. During the negotiations of the price, the CHS explained to PORTER that the child's mother was looking to "sell her for smack." As the meeting plan was finalized, the CHS informed PORTER that the child had engaged in sexual acts previously, but had never had sexual intercourse.

13

29.     On March 10, 2020, the CHS arrived at the agreed meeting location, McDonald's, 197 N. Jackson St, Oak Hill, OH 45656 to meet with PORTER. PORTER pulled into the parking lot, exited his vehicle and approached the CHS inside of McDonald's. The two engaged in a brief conversation, which was recorded via a device that JCSO had provided to the CHS. Agents reviewed that audio recording and found much of the conversation to be inaudible due to background noise inside the McDonalds. However, at one point, PORTER could be heard saying something to the effect that he would be done around midnight and then asked if he could text the CHS. Based on the plans that were established during the Facebook Messenger chats with the CHS, your affiant believes that this statement indicates that PORTER was going to take the fictitious child to engage in sexual activity, and would return the child to the CHS around midnight.

30.     At the time of PORTER's arrest, a cellular phone was seized from his person, which is awaiting forensic examination pursuant to a search warrant issued by a magistrate judge in the Southern District of Ohio. Subsequent to PORTER's arrest, he was informed of his Miranda Rights waived those rights and was interviewed by JCSO detectives and FBI agents. PORTER admitted to communicating with the CHS, but claimed that he only agreed to meet with the CHS to make sure the 7-year-old girl wasn't hungry. PORTER further stated that he communicated with the known CHS by Facebook Messenger, utilizing his Facebook user name "Larry PORTER," on his desktop computer located at his residence. PORTER also provided consent to search both his residence located at 9418 Lick Run Lyra, Wheelersburg, OH 45694 and any computers or storage media that were found in that residence. PORTER reviewed and signed both consent to search forms related to both the residence and the devices.

31.     Based on the foregoing, on Wednesday, March 11, 2020, FBI agents and deputies from the JCSO and Scioto County Sheriff's Office (SCSO), went PORTER's residence and recovered numerous computers, hard drives and other digital devices were found throughout the residence. Officers also noticed a very strong odor of marijuana, although only a very small amount of a leafy green substance appearing to be marijuana was found.

32.     Both prior and subsequent to PORTER's arrest, agents have obtained information indicating that he has sexually abused numerous children in Scioto County, and potentially elsewhere. Several sources have indicated to agents and other law enforcement officers that PORTER was known to provide various types of illegal drugs, including marijuana and pain pills to addicted persons in exchange for access to their children. This information is consistent with

14

information that was provided by the CHS regarding his/her prior interactions with PORTER. The historical information agents have obtained about PORTER is summarized below.

33. Approximately one year ago, law enforcement was provided with information from CHS 2, a source with direct access to children and family in the community where PORTER resides. CHS 2 has provided reliable information that has been corroborated since March 2019. CHS 2 has not been paid for information, and CHS 2 is not being provided any special benefit for information. CHS 2's motivation is to help children in CHS 2's community, to whom s/he has regular access.

34. CHS 2 informed law enforcement that s/he had concerns that PORTER has been sexually abusing generations of children. CHS had observed children who were believed to have been abused by PORTER grow up and have children of their own. The previously-abused adult parents had become drug addicted and would trade access to their children for drugs that PORTER provided to them or money they used to purchase drugs elsewhere.

35. CHS 2 provided information about a young child who was visibly upset and crying. The child informed CHS 2 that the child's father often takes the child's younger sister and mother to PORTER's house. The child, the sister and the mother would all go into PORTER's house, while the father waited outside. The child's statements led CHS 2 to believe that the child was implying that the mother and the children were being sexually abused by PORTER. CHS 2 related that there had been occasions when members of the community had made reports to the local child protective services (CPS) agency regarding specific children who were being abused by Porter. On more than one occasion when such a report was made, the child who was the subject of the report was thereafter seen with obvious signs of physical abuse, such as black eyes. CHS 2 believed that the children were being physically abused by their parents either as punishment for the CPS investigation of the sexual abuse by PORTER or in an attempt to prevent them from confirming that sexual abuse to CPS.

36. CHS 2 was at one time approached by two named individuals, one of whom had direct access to PORTER. These individuals told CHS 2 that PORTER had to be stopped, that PORTER possessed child pornography, thought to be on flash drives, and that PORTER would go to extremes to conceal the existence of the flash-drives.

37. The information obtained from CHS 2 led law enforcement to additional individuals who had information regarding PORTER's prior sexual abuse of minors. In August of 2019, agents from the FBI and Ohio Bureau of Criminal Investigations (BCI) interviewed

15

VICTIM 1, an adult who resided with PORTER for approximately seven years when she was a minor. VICTIM 1 stated that her mother became addicted to drugs that PORTER exposed her to, including "narco, klonopin, valium, Percocet, marijuana, and sometimes oxy," and that she observed multiple drug addicted parents bring their children to PORTER's house. VICTIM 1 was able to provide the name of one specific adult female and the name of the female's minor daughter, who she knew had been sexually abused by PORTER in exchange for drugs for the mother. VICTIM 1 also described trips that she took to Columbus, Ohio with PORTER, during which PORTER obtained drugs that he later sold from his residence. She described hidden compartments in PORTER's vehicle that was used to hide the drugs on these trips, and also described a hidden compartment under a "trapped door" in PORTER's residence, in which she believed that he stored marijuana and related drug distribution items.

38.    VICTIM 1 further revealed that PORTER had also sexually abused her when she was a child.  The abuse began with PORTER masturbating in front of VICTIM 1, but later involved PORTER forcing VICTIM 1 to masturbate him herself, and eventually progressed to oral and vaginal sex.  Several years prior to the oral and vaginal sexual abuse, PORTER had begun giving VICTIM 1 drugs, including cocaine and pills, and alcohol.  VICTIM 1 became drug addicted by the time she was 15 years old, but has stopped using drugs since she left Ohio several years ago.  VICTIM 1 also described how PORTER would record the sexual abuse of her using hidden cameras in his residence, and stated that she had seem child pornography involving her and other children on PORTER's computer. The last sexual encounter VICTIM 1 had with PORTER was in 2008, when she was approximately 15 years old.

39.    During the course of the consensual search of PORTER's residence, agents observed in plain view, a CD/DVD disc with a hand written label, "[VICTIM 1 name] Pics." Additionally, several of the CD/DVD, USB Flash drives, Floppy Disks and Memory Cards that were located at the residence contained hand written labels.  All of the items are awaiting forensic examination, pursuant to a federal search warrant issued on March 19, 2020.

40.    Since PORTER's arrest, local law enforcement has obtained information from additional sources, who have observed activity occurring at PORTER's residence in the past one to two weeks.  CHS 3, who is known to have direct visible access to PORTER's residence and who has known PORTER for decades, has provided information that has since been corroborated by law enforcement.  CHS 3 stated that on or about March 13, 2020, Crystal and Deanna PORTER, known relatives of PORTER's, had made numerous trips to PORTER's residence and

16

surrounding property. Crystal and Deanna PORTER, as well as other identified individuals had been seen taking several items from the inside of the residence and loading them into a vehicle. CHS 3 further indicated that Crystal and Deanna PORTER have been seen outside the residence digging multiple holes in the ground to attempt to locate storage containers that may contain cash money or electronic devices. CHS 3 indicated that he observed one of the family members remove what CHS 3 described as something resembling an 8-track cassette. During further conversation with the source, CHS 3 pointed to the hard drive area of a computer and stated that the hard drive was what he had seen Crystal and Deanna PORTER remove from PORTER's residence. CHS 3 further confirmed the existence of a trap door in PORTER's residence, and was able to provide a more specific location regarding that trap door.

41. Records from the JCSO jail indicated that some of Crystal and Deanna PORTER had visited PORTER at the jail in the days leading up to their visits to PORTER's property.

42. CHS 4 is an individual who has been known to SCSO detectives for more than two decades, and has provided information that has led to the arrests and conviction of other individuals. On or about March 17, 2020, CHS 4 contacted a SCSO detective and stated that a family member of hers, who lives near PORTER's residence had observed activity at PORTER's residence the day before. CHS 4 stated that a teal truck and a grey El Camino were at PORTER's residence, and that the grey El Camino belonged to an individual named Frankie who lived on Taylor Dutiel Road. According to CHS 4, Frankie and approximately one other male individual were taking property out of PORTER's residence and loading it into the grey El Camino. Further investigation of this information revealed that Frank E. ANDREWS, residing at 1045 Taylor Dutiel Road, Wheelersburg, Ohio 45694, is the registered owner of a grey Chevrolet El Camino bearing license plate number HFD1323. Further investigation also revealed that William David Cole residing at 3731 Pleasant Ave., Portsmouth, Ohio 45662, is the registered owner of a teal-colored Chevrolet pickup truck, bearing license plate number EUA7208.

43. On March 20, 2020, agents obtained and executed a search warrant at PORTER's residence, based on the information provided by CHS 3 and CHS 4 indicating that additional evidence of criminal offenses was still located at the residence. During the search, agents located the trap door described by VICTIM 1 and CHS 3, which officers had not been able to locate during the consensual search of PORTER's residence. The open hole that the trap door led to was empty, as were several other storage areas and ceiling tiles. There was no longer any detectable odor of marijuana in the residence.

17

44. Officers searching the property observed the area described by CHS 3 where Deanna and Crystal PORTER were observed digging. Officers dug in that area and located a 2GB SD memory card held within a sealed glass jar. Forensic examination of that device revealed the presence of three images depicting an identified adult female sexually assaulting a minor female child. One of the images depicted the minor female nude on a bed with her legs toward the camera and her nude genitalia in the very center of the photograph. The nude body of an adult female was visible sitting beside child. The second image depicted the same nude child in the same position, with the adult female leaning over her such that her face was visible. The third image depicted the back of the head of the adult female leaning over the genital area of the nude child, appearing that the adult female was performing oral sex on the child. The background of the images clearly show that they were taken inside the bedroom of PORTER's residence. Upon review by SCSO detectives, the identity of both the adult and minor females depicted in the photos was confirmed. CHS 3 had previously informed local officials that PORTER had forced this identified female to perform sexual acts on her child while PORTER recorded it, in exchange for drugs.

45. The photos described above were in a folder on the SD card that was labeled "101Nikon." Other photographs in this folder depicted, amongst other things, motorcycles and a silver convertible that appeared to be parked in PORTER's residence. Your affiant has learned from multiple sources, including the original CHS, that PORTER was in a motorcycle club. Other members of that club included Frank ANDREWS and David COLE.

46. On March 21, 2020, the identified female depicted in the photographs described above (hereinafter SUSPECT #1) was arrested on local charges of Rape. At the time of her arrest, SUSECT #1 initially made voluntary disclosures regarding the identity of the child depicted in the pictures described above, who is a child that VICTIM 1 and CHS 2 had previously informed law enforcement had been abused by PORTER.

47. During a subsequent recorded interview, SUSPECT #1 was informed of her Miranda Rights and waived those rights. She then disclosed the following, amongst various other things about PORTER and his associates:

- SUSPECT #1 initially met PORTER in approximately 2008, when she began purchasing marijuana from him;
- SUSPECT #1 subsequently started using, what she described as "H," which your affiant believes means heroin;
- PORTER always had pain pills, some of which he sold, but most of which he "kept for his girls";

18

- Beginning in approximately 2008 and continuing for numerous years, PORTER made SUSPECT #1 do sexual things, first with him, then with other females, including minor females, in exchange for marijuana, cash cigarettes, and what she described as "30's", which she said were pain pills, including oxycodone, that she took in order to avoid using heroin and PORTER frequently recorded the sexual acts;
- PORTER's sexual abuse progressively became more forceful, and he told her that he made the recordings of the sex acts so that she and the other women could never tell on him or else they would also get in trouble;
- SUSPECT #1 named numerous additional adult females who obtained drugs from PORTER in exchange for sexual acts with him and with other females, including the minor children of the adult females;
- On one occasion, SUSPECT #1 walked into PORTER's residence and observed him touch the nude breast and genitalia of a minor child known to SUSPECT #1
- SUSPECT #1 was aware of PORTER sexually abusing VICTIM 1 and VICTIM 2, because they both informed her of the abuse;
- SUSPECT #1 walked into PORTER's residence on one occasion in approximately 2008, and observed an adult female known to her engaging in sex acts with her minor daughter while PORTER watched and masturbated;
- SUSPECT #1 was shown the pictures that were recovered from PORTER's SD card, and she identified herself and the child who she estimated to be 7 or 8 years of age at the time in the pictures, stated that PORTER took the photos in approximately late 2012 to early 2013, the sex acts occurred in PORTER's bedroom, and in one of the pictures, an item visible on her arm was duct tape that he placed there to force her to actually touch the child's genitalia;
- PORTER got pain pills from an identified individual who arranged for the pills to be brought in from Florida;
- Frank ANDREWS was another associate of PORTER's, who exchanged drugs for sex with drug-addicted females, including SUSPECT #1, and PORTER would sometimes sell pills to ANDREWS;
- SUSPECT #1 also identified David COLE as an associate of PORTER's who had sex with the drug-addicted women that PORTER was controlling through his drug provision;
- PORTER utilized phones, including landlines, cell phones and social media, to communicate with her and other drug addicted parents to arrange meetings with the parents and their minor children for the exchange of drugs and cash for sexual activity with or by the minor children;
- SUSPECT #1 observed things that PORTER was looking at on the internet, which included pictures of children being sexually abused.

48. Two of the adult females that SUSPECT #1 had identified as obtaining drugs from PORTER in exchange for providing their minor children to be sexually abused were arrested on March 22, 2020 and charged with Complicity to commit rape or Rape. Both women admitted that they either provided their minor daughters to PORTER for sexual purposes, or engaged in sex

acts with their minor daughters at PORTER's direction, in exchange for drugs, including Oxycodone and marijuana, and cash.

49.    On March 23, 2020, agents met with CHS to confirm her knowledge of and relationship with PORTER. CHS stated that she met PORTER through her then-boyfriend in approximately 2009. Approximately 10 years ago, CHS began purchasing pills from PORTER. CHS confirmed that PORTER was in a motorcycle club, and that her prior boyfriend was also a member of the club. When CHS was approximately 19 years old, she had to sleep with PORTER and another member of the club in order for her boyfriend to gain membership to the club. On one occasion in approximately 2015 or 2016, CHS went to PORTER's residence and observed PORTER and an approximately 4 to 5 year old female child wearing only their underwear. On another occasion in the summer of 2019, CHS observed PORTER drop off an associate at a mutual friend's residence and then observed the associate sell marijuana to the mutual friend before PORTER picked the associate back up. CHS believed that the associate was ANDREWS, but was not able to identify a picture of ANDREWS.

50.    Three of the identified minor children were forensically interviewed on March 23, 2020. All three of the minor victims confirmed that they observed visual recording devices within PORTER's residence when they were in the residence. One of the minor victims, VICTIM 3, confirmed that she was anally and vaginally penetrated by PORTER, and that one some occasions PORTER took pictures of her while she was nude and/or engaged in sex acts. VICTIM 3 was shown the pictures that were recovered from the 2GB storage device found on PORTER's property, and confirmed she was depicted in those pictures. VICTIM 3 confirmed that she was given "candy" by PORTER, and described the candy as a white pill. She also stated that SUSPECT #1 received a blue pill, a white pill or a brown pill, as well as marijuana and money, from PORTER. The third victim, VICTIM 4, also confirmed that she had been sexually abused by PORTER in exchange for her mother receiving pills and money, and that PORTER had sometimes recorded the abuse. She also confirmed that SUSPECT #1 had at times been involved in the abuse. The abuse consisted of touching her genitalia and performing oral sex on her. PORTER had also provided her with some sort of pills, but she only pretended like she took them.

51.    On March 23, 2020, agents interviewed an adult female, CHS 5, who lives near PORTER's residence and began purchasing marijuana from PORTER in approximately 1996, when she was approximately 14 years old. CHS 5, who was incarcerated at the time of the

interview for burglary charges, stated that she has known Dave COLE[3] for many years and considers him to be a close friend. CHS 5 observed both COLE and ANDREWS receive pills and marijuana from PORTER in the past. At times when she would be at PORTER's residence to purchase drugs, she observed both COLE and ANDREWS transporting adult females and their children, including VICTIM 3, VICTIM 4 and their mother, from PORTER's residence. She is further aware that PORTER previously utilized a landline telephone to communicate with his associates regarding drugs and women, but that PORTER, ANDREWS and COLE all now utilize cellular phones to communicate with each other, as well as others involved in their drug and sexual exploitation activities. She also knows them to utilize Facebook for these purposes. CHS 5 observed VICTIM 3 and VICTIM 4, their mother and ANDREWS and COLE at PORTER's residence frequently.

52.     Information obtained from the Ohio Law Enforcement Gateway ("OHLEG") reveals that Crystal D. PORTER obtained a driver's license on August 11, 2018, and listed her residential address as the SUBJECT PREMISES. On March 23, 2020, your affiant conducted surveillance at the SUBJECT PREMISES and observed a blue Hyundai vehicle bearing license plate # HNQ3059. OHLEG records confirm that this vehicle is registered to Crystal D. PORTER. Additionally, during the interview of VICTIM 1, she stated that PORTER's daughter Crystal lived in Columbus.

## VII. CONCLUSION

53.     Based on all of the forgoing factual information, your affiant submits that there is probable cause to believe that Larry Dean PORTER has committed numerous violations of 18 U.S.C. §§ 1591, 2251, 2252, 2252A and 2422(b) and 21 U.S.C. § 851. The foregoing factual information further provides reason to believe that Deanna and Crystal PORTER have communicated with PORTER since his arrest, and thereafter obtained numerous objects from his residence. The fact that agents discovered a hidden device from PORTER's property where Deanna and Crystal PORTER were searching and that device was found to contain evidence of PORTER's sexual offenses, provides reason to believe that Deanna and Crystal PORTER removed other evidence of PORTER's crimes and are currently hiding that evidence at their residences. Similarly, the facts that officers were not able to locate the hidden compartment in PORTER's residence during the consensual search; that they smelled a strong odor of marijuana

---

3 Your affiant is aware, through interviews of various informants in this investigation, that William David COLE, is known by his friends and associates as Dave COLE. His OHLEG registration lists his name as "W David Cole."

at the time of the consensual search, but did not find any marijuana; that they found the empty hidden compartment at the time of the execution of search warrant and did not observe any marijuana odor at that time, provides reason to believe that Deanna and Crystal PORTER have removed evidence of drug activity from PORTER's residence. In light of this, your affiant respectfully submits that Deanna and Crystal PORTER have committed violations of 18 U.S.C. §§ 3, 1519, 1591(d), and evidence of those violations, as well as evidence of the drug trafficking and sexual abuse and sex trafficking offenses committed by Larry Dean PORTER, is located on the SUBJECT PREMISES. Your affiant respectfully requests that the Court issue a search warrant authorizing the search of the SUBJECT PREMISES described in Attachment A, and the seizure of the items described in Attachment B.

## REQUEST FOR SEALING

54.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Michael A. Harey
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 24th day of March, 2020.

Elizabeth Preston Deavers
United States Magistrate Judge
United States District Court, Southern District of Ohio

## ATTACHMENT A
### PROPERTY TO BE SEARCHED

The place to be searched is the residence described below, including all its appurtenances, parking areas, outdoor working areas, detached buildings, individuals at the residence who may be in possession of a mobile computing device, and any computing related devices or digital media located therein:

The address of 1475 Bryden Road, Columbus, Ohio 43205, depicted below, is a three-story multi-family residence with a brown brick and red and blue siding exterior. The residence has two main entrance ways leading to a split porch. Over the right entrance the numbers "1475" are affixed above the porch, which leads to a white screen door and front door.



**ATTACHMENT B**
**PERSON TO BE SEARCHED**

Crystal D. Porter, is a white female having a date of birth of March 9, 1981, with brown hair and

blue eyes, standing approximately 5 feet and 5 inches tall, and weighing approximately 200

pounds.

## ATTACHMENT B
## PROPERTY TO BE SEIZED

The following materials which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 3, 1519, 1591(a) and (d), 2251(a), and 2252, and Title 21, United States Code, Sections 841 and 846.

1. Computer(s), computer hardware (including but not limited to central processing units; internal and peripheral storage devices such as, external hard drives, floppy disk drives, diskettes, flash/thumb drives, and other memory storage devices), mobile computing devices, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in children; or produce, distribute, possess, or receive child pornography or child erotica.

2. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or online storage or chat programs), utilities, compilers, interpreters, and communications programs.

3. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs, electronic messages, and handwritten notes) pertaining to the production, possession, receipt, or distribution of child pornography.

4. In any format and medium, all originals, computer files, copies, and negatives of child pornography.

5. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications related to the sexual abuse or exploitation of minors.

6. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages,

25

and other digital data files) that concern any accounts with an Internet Service Provider or Electronic Communications Service.

7. Any and all files, documents, records, or correspondence, in any format or medium (including, but not limited to, network, system, security, and user logs, databases, software registrations, data and meta data), that concern user attribution information.

8. Any and all visual depictions of minors, for comparison to any child pornography or child erotica found during the execution of this search warrant or obtained during the course of this investigation.

9. Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described in Attachment B, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

10. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct.

11. Any and all communications between any identified potential co-conspirators, including, Larry Dean PORTER, Deanna Sue PORTER, Crystal D. PORTER, Frank E. ANDREWS, and William David COLE, and any as yet unidentified potential co-conspirators relating to:

    A. The location, disposition, alteration, concealment or destruction of evidence of Larry Dean PORTER's commission of child sex trafficking, child pornography, and drug trafficking offenses;

    B. The existence of any investigations, whether at the state, local or federal level, into Larry Dean PORTER's child sex trafficking, child pornography, and drug trafficking offenses;

    C. Any relief or assistance provided to Larry Dean PORTER in order to hinder his apprehension, trial, or punishment.

12. Any and all controlled substances, and any and all items related to the ordering, manufacturing, packaging, possession, storage, shipment, sale, and/or distribution of controlled substances, including, but not limited to the following:

    A. Any and all log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers relating to the transportation, ordering, purchasing, processing, storage,

and distribution of controlled substances, as well as all records of assets, liabilities, income and expenses;

B. Any and all books, records, invoices, receipts, records of real estate transactions, financial statements, bank statements, canceled checks, deposit tickets, passbooks, money drafts, withdraw slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, wire transfer applications and/or receipts, fictitious identification, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money;

C. Any and all quantities of United States currency;

D. Communication records and histories made through and/or from applications (known as "Apps"); emails; texts; calls or other media contained on the electronic devices to be searched and all attachments included in such communications; and

E. Contact lists and any documents reflecting names, addresses, email addresses, telephone numbers, fax numbers and/or other contact information.